Case to recover damages from the defendant for negligence in (248) managing and steering his raft in the Cape Fear River, by which an unfinished raft of the plaintiff was broken from its fastenings and the timber lost.
Plaintiff called as a witness James Colvill, who swore that he was employed by the plaintiff to watch a raft of timber which he was making in the river, and guard it from the dangers of a freshet. The witness stated that the clamp or unfinished raft was tied to a tree on the shore by an inch rope. In consequence of a high freshet — a rise of 20 feet of water, which came very suddenly in the river — he went to the landing on the morning of the day the clamp was broken, and securely fastened the same by an inch rope to a tree higher up the bank. At a late hour of the day he went again to the river and found the plaintiff's timber gone, and saw upon the trees, where the rope had been tied, the mark made by the rope, as if it had been violently strained. The witness further stated that the clamp was in a cove, made by a bed in the river; was at a public rafting and landing place, a place where raftsmen coming over the falls or rapids were accustomed to stop for the purpose of discharging the extra hands necessary to bring the raft over the falls. He further said that there were 24 sticks of timber in plaintiff's clamp.
Plaintiff next examined Kedar Kennedy, who swore that he came over the falls on the day plaintiff's timber was lost, and tried to "take up"
his raft at the "upper landing," next to the falls; failing in this, he followed the current until he came within 80 or 100 yards of the "cove," when, seeing a clamp or raft of timber at the place described by the first witness, he ordered his hands to "pull out" and not to strike it. He then ran with the current about two miles, until he came into "eddy water" and took up his raft. He stated that he could see plaintiff's (249) raft at the distance of 80 yards, and could easily avoid striking against it, after seeing it at that distance. He further stated that the current of the river set in a direction off from plaintiff's timber, and was sufficiently strong to carry off a raft, if no effort had been made to draw it into the shore. *Page 172 
Thomas Bolin was next introduced, who swore that he was on defendant's raft the day the plaintiff's clamp was broken; said that the clamp might have been seen at the distance of 75 yards, but was not seen at that distance; that he was standing upon the raft, near the front, not employed at the time; that most of the hands were working to get the raft in near the shore for the purpose of "taking up"; that so soon as the alarm was given about the clamp ahead, the hands commenced working the fore oar for the purpose of throwing the head of the raft out into the main stream, so as not to "butt" the plaintiff's timber; that the front of the raft, being thrown suddenly out, caused the stern to wheel in, which "dragged" or "rubbed" the plaintiff's timber, and caused the clamp to be broken, and the pieces scattered in the current. Witness further said he thought all was not done that might have been done to prevent the injury to the plaintiff.
Plaintiff gave evidence of the value of his timber, and closed his case.
The defendant, to support his plea of "not guilty," examined first James McAllister, who swore that he had been many years acquainted with rafting and "navigating" the falls; that on this occasion he went on defendant's raft at his request and assisted the hands in going over the falls; that there were ten or twelve hands on the raft, more than the number usually employed in the highest freshet; that they were safely over the falls, and drew in towards the shore, trying to take up, and were trying for half a mile — throwing out their ropes (250) around trees and catching the limbs; that when the alarm was given about the timber ahead at the landing, the main force was applied to the fore oar to throw the head of the raft out into the stream and to avoid a collision with plaintiff's clamp; that a part of the hands were also working at the "hind oar" to prevent its dragging or rubbing; but as soon as the front of the raft passed by the plaintiff's without striking, an effort was made by the hands to throw out the stern towards the current, so as to prevent striking either with the side or end of defendant's raft; but they failed in this, and the clamp was broken loose by the hind end of the raft. He further swore that the force of the hands was sufficient; that some of them were trained and experienced in the management of rafts, and that all was done that could be done, after seeing plaintiff's timber, to prevent its loss. Says that he was within 50 yards of the clamp when he discovered it; that he might have passed by it safely had he seen it a distance of 75 or even 50 yards. No hand is ever employed on the river merely as a "lookout." He further swore that the force of the hands was properly directed, and that not only was the proper effort made, but in his opinion the whole management of the raft was skillfully conducted. He further swore that he was looked up *Page 173 
to as the manager of defendant's raft; that at the time of the "alarm" he ordered all hands to the fore oar, which he admitted to be wrong in ordering all hands. He further said that negro Frank, an experienced hand, remained at his post at the hind oar, notwithstanding the order.
Hugh McLean swore for the defendant: Was also upon the raft. Swore in all material points substantially as the witness McAllister. He said that when plaintiff's clamp was discovered, he and several others were clinging to the limbs and bushes, trying to take up the raft of the defendant, and that as soon as the clamp was seen, they (251) immediately made all the efforts in their power to prevent injury. He further swore that there was no lookout on the raft; that he never heard of a "lookout" on the Cape Fear; that plaintiff's raft might have been seen by a lookout.
Julius McLean, witness for defendant, was also on defendant's raft. Swore in all material matters as the other witnesses for defendant. He said that Bolin, McAllister, McLean, defendant, and himself were the only white persons present on defendant's raft.
His Honor charged the jury that the defendant, being in the prosecution of a lawful employment, was only bound to use ordinary care — such care as an ordinarily prudent man would use in the management of his own affairs. And if, in this matter, he did not use such care, the plaintiff, was entitled to the verdict.
Plaintiff's counsel then requested the court to charge the jury that if the defendant, when attempting to "take up," saw the raft of the plaintiff, or might by a careful lookout have seen it, it was his duty in taking up to have taken effectual efforts to have prevented a collision.
His Honor would not so instruct the jury, but remarked that the defendant was only bound to use ordinary care, and what that was he had already explained.
Plaintiff's counsel then prayed the court to instruct the jury that, upon the whole case, if they believed the testimony, there was negligence on the part of the defendant; but the court declined so to instruct the jury, and repeated the instructions as to ordinary care.
Verdict for defendant, and plaintiff appealed.
Plaintiff's counsel prayed his Honor to instruct the jury that upon the whole case, if they believed the testimony, there was negligence on the part of the defendant. This instruction was refused, and for this the plaintiff excepts. (252) *Page 174 
The terms used by the plaintiff are so general as to impose on him the disadvantage of having all the testimony, where it conflicts, taken against him. But even with this allowance, there was negligence on the part of the defendant.
Plaintiff's unfinished raft was fastened at a usual landing place, where rafts were sometimes constructed, and descending rafts were frequently taken up. It could be seen by the hands on a descending raft at the distance of 75 or 80 yards; and they could without difficulty avoid a collision if it was seen at any time before coming within 50 yards. The defendant, without looking to see whether the landing was preoccupied, as there was reason to suppose it might be, approached so near that when the plaintiff's raft was seen it was too late, and the collision was inevitable. These are the facts. They establish negligence and fix the defendant with a liability to make compensation for the damage.
Common prudence requires, and, in fact, it would seem to be a natural impulse, that one on a descending raft, before deciding to "take up" at a usual landing place, should look and see whether it was preoccupied, as soon as he came to a position from whence the fact could be ascertained, and, at all events, before coming so near that seeing could do no good, and the consequences be the same as if he had not looked at all, but having decided to "take up" at that place, approached blindly and without regard to the damage he might cause to others.
If plaintiff's raft had been in a position from which it could not be seen in full time to avoid a collision, it might have been his duty to keep a hand there or fix up a signal in order to give notice; but such was not the case, and the entire fault was on the part of the defendant.
(253) What amounts to negligence is a question of law. This is settled by numerous cases. And the plaintiff was entitled to special instructions upon certain facts presented by the testimony or "upon the whole case," if he chose to subject himself to the disadvantage above pointed out. Consequently, it is error to refuse such special instructions when prayed for, and to submit the matter to the jury "broadcast," with the general instruction that "the plaintiff was entitled to recover if the defendant did not use such care as an ordinarily prudent man would use in the management of his own affairs."
PER CURIAM. Venire de novo.
Cited: Hathaway v. Hinton, 46 N.C. 246, 247; Brock v. King, 48 N.C. 48;S. v. Allen, ibid., 264; Woodward v. Hancock, 52 N.C. 386; Pleasantsv. R. R., 95 N.C. 203; Emry v. R. R., 109 N.C. 592, 597, 612; Cable v.R. R., 122 N.C. 895; Thomas v. Shooting Club, 123 N.C. 288; Cox v. R.R., ibid., 607; Coley v. R. R., 129 N.C. 413. *Page 175